**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ERIC J. FLANNERY**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-03108-ABJ** |
| **DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH**, *et al.*, | |
| **Defendants.** | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendants District of Columbia Department of Health and LaQuandra S. Nesbitt (collectively, the District) move under Fed. R. Civ. P. 12(b)(1) and (6) and 28 U.S.C. § 1367 to dismiss Plaintiffs Eric J. Flannery and Drane Flannery Restaurant, LLC, t/a The Big Board's (collectively, Big Board's) Complaint [1] for lack of jurisdiction or failure to state a claim. A memorandum of points and authorities as well as a proposed order are attached. Because this Motion is dispositive, the District has not sought Big Board's consent. *See* LCvR 7(m).

Date: January 13, 2023.                    Respectfully submitted,

                                           BRIAN L. SCHWALB
                                           Attorney General for the District of Columbia

                                           STEPHANIE E. LITOS
                                           Interim Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Matthew R. Blecher*
                                           MATTHEW R. BLECHER [1012957]
                                           Chief, Civil Litigation Division, Equity Section

                                           */s/ Adam J. Tuetken*
                                           ADAM J. TUETKEN [242215]
                                           MICAH BLUMING [1618961]

Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ERIC J. FLANNERY,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-03108-ABJ** |
| **DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    I.      Statutory and Regulatory Background ................................................. 2

          A.      The Home Rule Act ................................................................ 2

          B.      The Public Emergency Act ..................................................... 4

          C.      The District's Response to COVID-19 .................................... 5

    II.     Big Board's Violations ....................................................................... 8

    III.    Procedural History ........................................................................... 10

LEGAL STANDARDS ..................................................................................... 11

ARGUMENT ................................................................................................... 12

    I.      Because Big Board's Claims Are Mostly District-Law Claims and Its One Federal Claim Should Be Dismissed, the Court Should Not Exercise Jurisdiction. ................................................................. 13

          A.      The Declaratory Judgment Act Claim Is Not Cognizable. ...... 13

          B.      The Home Rule Act Claim Is Not Cognizable Under § 1983 and, in Any Event, Is a District-Law Claim. ..................................... 14

                1.      Big Board Cannot Assert a § 1983 Claim for Alleged Violations of the Home Rule Act.................................... 14

                2.      Even if Brought Directly Under the Home Rule Act, Big Board's Claim Is a District-Law Claim. ...................... 16

          C.      The Court Should Dismiss the Procedural Due Process Claim and Decline to Exercise Supplemental Jurisdiction.......................... 18

    II.     Big Board Lacks Standing. ................................................................ 19

          A.      Big Board Only Alleges Past Injuries, So It Lacks Standing to Seek Declaratory Relief. ................................................................... 19

       B.      Big Board's Past Injuries Do Not Confer Standing to Pursue Its Claims. ................................................................................................... 22

            1.     Home Rule Act ................................................................................. 22

            2.     Procedural Due Process ................................................................... 26

            3.     DCAPA ............................................................................................ 27

III.     The Complaint Fails to State a Claim. .................................................... 28

       A.      The Home Rule Act Claim Fails.................................................................. 28

       B.      The Procedural Due Process Claim Fails..................................................... 32

       C.      The DCAPA Claim Fails. ........................................................................... 34

CONCLUSION........................................................................................................... 38

## INTRODUCTION

As the Omicron wave of the COVID-19 pandemic peaked and took over 15,000 American lives a week,[1] a restaurant in the District of Columbia, Big Board, defied Mayor's orders that restaurants ensure patrons wear face masks and show proof of vaccination. Faced with this flagrant disregard of the law and public health, the District's Department of Health (DC Health) suspended Big Board's restaurant license pending compliance with pandemic safety measures. Big Board never complied. But the pandemic subsided, so the Mayor's orders lifted. And Big Board then reopened without paying any penalties, save a $100 reinspection fee. Nonetheless, Big Board now brings this federal lawsuit to challenge the Mayor's orders and the D.C. Council's legislation which authorized them.

The Court can dispense with this dispute over expired laws—and $100—in a few ways. First, this case does not belong in federal court. Properly construed, the Complaint alleges only one claim with a possible basis for federal jurisdiction—Count II, asserting a due process violation under 42 U.S.C. § 1983—but that claim has no merit as pleaded, so the Court should decline jurisdiction over the remaining claims. Second, Big Board lacks standing because it challenges actions unconnected to its alleged injuries, and none of its claims would redress any of the injuries allegedly suffered. Third, Big Board fails to state a claim. In Count I, Big Board alleges that the Council misused its legislative powers to authorize the Mayor's orders without congressional review, but the Council legislated by recognized, legitimate means and repeatedly put its COVID-19 legislation before Congress without disapproval. Next, in Count II, Big Board alleges that a District statute prevented it from challenging the Mayor's orders until now, but Big

---

[1]     Ctrs. for Disease Control & Prevention, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, https://tinyurl.com/bdffdkj2 (last visited Jan. 13, 2023) (select "United States" and "Weekly Deaths").

Board had means of obtaining judicial review earlier—none of which it used.  Finally, in Count III, Big Board alleges that DC Health lacked authority to suspend restaurant licenses for violating COVID-19 measures, but Big Board overlooks statutes and regulations whose plain terms authorized the suspension here.  And Count IV, arising under the Declaratory Judgment Act, is not a standalone claim.  At bottom, Big Board wants to air grievances about how the District tried to save lives during a once-in-a-century pandemic.  This Court need not hear it.

## BACKGROUND

### I.    <u>Statutory and Regulatory Background</u>

This case involves the general legislative powers of the Council of the District of Columbia (as contained in the Home Rule Act), the Council's and Mayor's powers to respond to emergencies (as contained in the Public Emergency Act), and how those powers were used in response to COVID-19.  An overview of each first is helpful.

### A.    <u>The Home Rule Act</u>

For nearly fifty years, the District has enjoyed the power to govern itself thanks to the District of Columbia Self-Government and Governmental Reorganization Act or "Home Rule Act," Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code § 1-201.01 *et seq.*).  With the Home Rule Act, Congress delegated its constitutional power under the District Clause, *see* U.S. Const., Art. I, § 8, cl. 17, to legislate for the District.  *D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia* (*DCACPS*), 930 F.3d 487, 489–90 (D.C. Cir. 2019).  By doing so, Congress "sought to 'relieve [itself] of the burden of legislating upon essentially local District matters.'"  *Id.* at 490 (quoting D.C. Code § 1201.02(a)).  To that end, the Home Rule Act prescribes the lawmaking process for the Council, the District's legislative body.  *E.g.*, D.C. Code §§ 1-204.1–1-204.13.  The Council uses three forms of legislation: permanent, emergency, and temporary.

2

Generally, legislative acts passed by majority-vote of the Council following two readings become permanent District law after 30 days.  *Id.* § 1-206.12(c)(1).  During that period, Congress may review the legislation, but only if both Houses pass a joint resolution of disapproval will the legislation fail to take effect.  *Id.*  Just three disapproval resolutions have ever passed—and the last was over 30 years ago.  168 Cong. Rec. E937 (daily ed. Sept. 15, 2022) (statement of Del. Holmes Norton).  Separate from the disapproval mechanism, Congress can always amend or repeal any act of the Council.  D.C. Code § 1-206.01.

Recognizing, however, that congressional review could hinder the Council's ability to respond to emergencies, Congress included provisions in the Home Rule Act for immediately effective legislation.  *Id.* § 1-204.12(a).  Under those provisions, "[i]f the Council determines, by a vote of two-thirds of the members, that emergency circumstances make it necessary that an act be passed after a single reading, or that it take effect immediately upon enactment, such act shall be effective for a period of not to exceed 90 days."  *Id.*  Such emergency acts do not require a congressional review period.  *Id.* § 1-206.12(c)(1).

Finally, the Council has a third type of legislation: temporary.  "When the Council approves emergency legislation, its Rules also authorize the Council to consider substantially similar temporary legislation that bypasses committee referral and is valid for 225 days after congressional review."  *Pub. Media Lab, Inc. v. District of Columbia*, 276 A.3d 1, 6 n.3 (D.C. 2022) (citing Rules of Organization and Procedure for the Council of the District of Columbia, Council Period 24, Rule 413 (Council Rule 413), 68 D.C. Reg. 228, 292 (Jan. 8, 2021)).  Unlike emergency legislation, temporary legislation requires two readings and congressional review (the requirements for permanent legislation).  *Id.*  But because it bypasses the committee process, it is a "fast-track means by which to pass legislation."  *Zukerberg v. D.C. Bd. of Elections & Ethics*,

97 A.3d 1064, 1069 (D.C. 2014).  The Council often introduces temporary legislation in tandem

with identical or similar emergency and permanent legislation.  The temporary legislation

ensures that, if the legislative process for the permanent legislation takes longer than 90 days

(when the emergency legislation would expire), there is "no 'gap' between the expiration of

[emergency legislation] and the enactment of permanent legislation."  *Winters v. Ridley*, 596

A.2d 569, 572 (D.C. 1991) (Schwelb, J., concurring).  Temporary legislation, the D.C. Court of

Appeals has explained, is consistent with the Home Rule Act, and—indeed—Congress has

implicitly approved it.  *United States v. Alston*, 580 A.2d 587, 598 (D.C. 1990) (Rogers, J.).

    **B.**    **The Public Emergency Act**

The District's Public Emergency Act of 1980 gives the District's executive branch

authority and capacity to respond to public emergencies.  *See* D.C. Code § 7-2301 *et seq.*  The

Act provides that, in response to a "public emergency" (including an "[o]utbreak of a

communicable disease"), "the Mayor may issue an emergency executive order" which, among

other things, may identify "measures necessary to relieve the public emergency" and "[p]repare

for, order, and supervise the implementation of measures designed to protect persons and

property in the District."  *Id.* §§ 7-2301(3)(I), 7-2304(a)(2), (b)(3).  The order may provide for

fines of up to $1,000 for violations.  *Id.* § 7-2307.  Such an order is typically effective for 15

days.  *Id.* § 7-2306(a).  But an order may be extended for up to 15 more days "upon request by

the Mayor for, and the adoption of, an emergency act by the Council."  *Id.* § 7-2306(b).  The

Mayor may also declare a "public health emergency" and "issue an additional executive order"

which includes measures to mobilize healthcare providers.  *Id.* § 7-2304.01(a), (d).

In addition, the Public Emergency Act postpones certain administrative procedures under

the D.C. Administrative Procedure Act (DCAPA), D.C. Code § 2-501 *et seq.*, while an agency

acts due to an emergency.  Specifically, the Act provides: "No action taken pursuant to an

emergency executive order issued by the Mayor pursuant to this chapter shall be subject to § 2-509, until after the expiration date of the emergency executive order."  D.C. Code § 7-2308. Section 2-509, in turn, outlines procedures for "contested cases" under the DCAPA.  Contested cases are essentially "formal adjudications." *Sanchez v. Off. of the State Superintendent of Educ.*, 45 F.4th 388, 402 (D.C. Cir. 2022), *cert. denied*, --- S. Ct. ----, 2023 WL 124112 (Jan. 9, 2023).  If the law (*e.g.*, a statute or regulation) requires that an agency action use a formal hearing, then that proceeding qualifies as a "contested case," must follow procedures outlined in D.C. Code § 2-509, and is reviewable directly by the D.C. Court of Appeals.  *Owens v. D.C. Water & Sewer Auth.*, 156 A.3d 715, 721 (D.C. 2017).

### C.    The District's Response to COVID-19

Following the outbreak of COVID-19, the Mayor issued orders on March 11, 2020, declaring a public emergency and public health emergency.  Mayor's Order 2020-045, 67 D.C. Reg. 2,956 (Mar. 11, 2020); Mayor's Order 2020-046, 67 D.C. Reg. 2,961 (Mar. 11, 2020). These orders "triggered a progression of legislative responses by the Council." *District of Columbia v. Towers* (*Towers I*), 250 A.3d 1048, 1051 (D.C. 2021) (per curiam).  On March 17, the Council passed emergency legislation which took several actions in response to the pandemic.  COVID-19 Response Emergency Amendment Act of 2020 (March 17, 2020 Emergency Act), D.C. Act 23-247, 67 D.C. Reg. 3,093 (Mar. 20, 2020).  Relevant here, the legislation amended the Public Emergency Act in two ways:  First, the legislation provided that the Mayor could extend her COVID-19 orders "for an additional 30-day period." *Id.* § 301(b). Second, the legislation made clear that "[t]he Mayor may revoke, suspend, or limit the license, permit, or certificate of occupancy of a person or entity that violates an emergency executive order." *Id.* § 301(c).  By its terms, the act expired after 90 days. *Id.* § 703.

Pursuant to this legislation, the Mayor extended her orders on March 20.  Mayor's Order

2020-050, 67 D.C. Reg. 3,601 (Mar. 20, 2020).  With the pandemic only worsening as the

expiration of her orders neared, the Council passed emergency legislation authorizing the Mayor

to further extend her orders, which she did.  COVID-19 Response Supplemental Emergency

Amendment Act of 2020, D.C. Act 23-286, § 401, 67 D.C. Reg. 4,178, 4,208 (Apr. 17, 2020);

Mayor's Order 2020-63, 67 D.C. Reg. 4,410 (Apr. 17, 2020).  As the pandemic continued

through 2020 and 2021, the Council periodically adopted similar legislation, and the Mayor

extended her orders.  Compl. ¶¶ 27, 31.

But the Council did not legislate in response to COVID-19 solely with emergency

legislation.  Rather, the Council often passed temporary legislation in tandem with emergency

legislation that authorized the Mayor to extend the public emergency and take other actions in

response to the pandemic.  *E.g.*, Coronavirus Support Temporary Amendment Act of 2020,

§ 507(d), (e), D.C. Act 23-334, 67 D.C. Reg. 8,622, 8,680–81 (July 17, 2020); D.C. Law 23-130,

67 D.C. Reg. 12,236 (Oct. 23, 2020).[2]  For example, temporary legislation was in effect until

February 4, 2022, explicitly stating that the Mayor could revoke District-issued licenses if a

licensee violated emergency orders.  Coronavirus Support Temporary Amendment Act of 2021

(June 24, 2021 Temporary Act), § 507(d), D.C. Act 24-62, 68 D.C. Reg. 4,824 (May 7, 2021);

D.C. Law 24-9, 68 D.C. Reg. 6,913 (July 16, 2021) (previously codified at D.C. Code

§ 7-2307(b)).  Each of these acts was reviewed by Congress without disapproval.  *E.g.*, 68 D.C.

---

[2]     Temporary and permanent legislation is first assigned a "D.C. Act" number and published in the D.C. Register.  Once the congressional review period ends, the legislation is assigned a "D.C. Law" number, and a separate notice is published in the D.C. Register stating that the legislation has completed review by Congress.  For ease of reference, any temporary legislation referenced here will include citations to both the D.C. Act and the D.C. Law.

Reg. at 6,913.  In total, the Council passed six such acts.  A full chronology of the Council's

temporary legislation passed in response to the COVID-19 pandemic is included in Appendix A.

In December 2021, the Omicron variant of COVID-19 swept across the country.  Ankur

Banerjee, *U.S. CDC Estimates Omicron Variant to be 58.6% of Cases, Revises Projection*,

Reuters (Dec. 28, 2021), https://tinyurl.com/mry3thyp.  By late December, the District faced its

highest number of COVID-19 cases—ever.  *See* note 1, *supra* (select "District of Columbia" and

"Weekly Cases").  In response, the Council adopted a resolution declaring its intent to authorize

the Mayor to continue the public emergency.  Public Emergency Extension Emergency

Declaration Resolution of 2021, Res. 24-337, 68 D.C. Reg. 14,109 (Dec. 31, 2021).  With the

resolution, the Council introduced emergency and temporary legislation to authorize the Mayor

to extend her orders through March 17, 2022.  Public Emergency Extension Emergency

Amendment Act of 2021 (Jan. 6, 2022 Emergency Act), D.C. Act 24-276, § 2, 69 D.C. Reg. 214

(Jan. 14, 2022) (effective Jan. 6, 2022); Public Emergency Extension Temporary Amendment

Act of 2021, § 2, D.C. Act 24-292, 69 D.C. Reg. 599 (Jan. 28, 2022).  The emergency legislation

was adopted on January 6, 2022, and the Mayor extended her orders that same day.  Council of

the Dist. of Columbia, *B24-0572 – Public Emergency Extension Emergency Amendment Act of

2021*, https://lims.dccouncil.gov/Legislation/B24-0572 (providing legislative timeline); Mayor's

Order 2022-007, 69 D.C. Reg. 335 (Jan. 6, 2022).  The temporary legislation was approved

shortly thereafter and then transmitted to Congress on January 31.  *See* D.C. Law 24-102, 69

D.C. Reg. 2,372 (Mar. 25, 2022).  The congressional review period closed with no disapproval,

and the temporary legislation became effective on March 15.  *Id.*

Following the introduction of the resolution and legislation, the Mayor issued two orders announcing measures to combat the Omicron wave.[3]  As relevant here, the first required all persons to wear face masks while in restaurants, effective immediately.  Mayor's Order 2021-147, §§ IV, X, 68 D.C. Reg. 13,954, 13,956–57, 13,959 (Dec. 24, 2021); *see also* Mayor's Order 2022-018, § II, 69 D.C. Reg. 766, 767 (Jan. 28, 2022) (extending Mayor's Order 2021-147 through February 28, 2022).  The second required restaurants to only allow patrons to enter their premises upon showing proof of vaccination against COVID-19 (subject to several exemptions), effective January 15.  Mayor's Order 2021-148, §§ II(1)(a), (3), IV, 68 D.C. Reg. 14,222, 14,224–25, 14,227 (Dec. 31, 2021).  Both orders delegated enforcement authority to, among others, DC Health, which could summarily suspend licenses it administered and issue fines.  Mayor's Order 2021-147 § VIII(2)-(3), 68 D.C. Reg. at 13,958; Mayor's Order 2021-148 § III(5)-(6), 68 D.C. Reg. at 14,226–27.  The orders cited several sources of authority, including the Public Emergency Act and a statute allowing the Mayor to "issue rules to prevent and control the spread of communicable diseases," D.C. Code § 7-131(a).  Mayor's Order 2021-148 at 1, 68 D.C. Reg. at 14,222; *see also* Mayor's Order 2021-147 at 1, 68 D.C. Reg. at 13,954.

## II.    **Big Board's Violations**

On January 21, shortly after these orders went into effect, DC Health received a complaint that Big Board was violating COVID-19 safety measures.  Defs.' Ex. D, D.C. Off. of

---

[3]     At the time, these orders were immediately supported by emergency legislation authorizing the Mayor to extend the emergency until January 7, 2022.  Foreclosure Moratorium Extension, Scheduled Eviction Assistance, Public Emergency Extension, and FOIA Tolling Emergency Amendment Act of 2021, D.C. Act 24-178, § 3, 68 D.C. Reg. 10,692, 10,693 (Oct. 15, 2021).

Admin. Hr'gs Order on Summ. Adjudication (OAH Order) 8.[4]  DC Health inspected Big Board's premises that day and found that Big Board did not require face masks or proof of vaccination. OAH Order 8.  DC Health returned to inspect Big Board more than a week later, on February 1, and found continuing violations.  *Id.*

So, on February 1, DC Health issued a notice of infraction to Big Board, citing it for one violation of the mask requirement and one violation of the proof-of-vaccination requirement occurring that day.  Pls.' Ex. A, First Notice of Infraction (1st Not.) [1-1] 1.  DC Health assessed fines of $1,000 for each violation, for a total of $2,000.  *Id.*  Finding that Big Board's violations threatened public health, DC Health suspended Big Board's restaurant license until Big Board scheduled an inspection to show its compliance with COVID-19 safety measures, which carried a separate $100 fee.  *Id.* at 4, 6.  The February 1 notice included a standard form instructing Big Board that it must answer within 15 days and that it could deny that a violation had occurred, after which "[a] hearing will be scheduled" before the Office of Administrative Hearings (OAH). *Id.* at 8.  Big Board did not immediately answer the notice.  The following week, DC Health served a second notice of infraction, citing Big Board for the two violations witnessed on January 21.  Pls.' Ex. B, Second Notice of Infraction (2d Not.) [1-2] 2.  This notice assessed an additional $2,000 in fines.  *Id.*

---

[4]    The Court may consider, on a motion to dismiss, public records and filings before an administrative agency.  *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017); *see also, e.g.*, *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 19 (D.D.C. 2014) (considering District agency filings); *Vizion One, Inc. v. District of Columbia*, No. 14-cv-883, 2015 WL 4247795, at *4 (D.D.C. July 13, 2015) (same).  In addition, "[p]ublic records are subject to judicial notice on a motion to dismiss when referred to in the complaint and integral to the plaintiff's claim."  *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018).  The Complaint refers directly to the administrative proceedings, and Big Board's due process claim turns on how and when those proceedings unfolded.  Compl ¶¶ 40 n.2, 47–51.

A week later, and in response to declining COVID-19 cases, the Mayor issued an order

declaring that the proof-of-vaccination requirement would expire on February 15 and the mask

requirement would expire on March 1.  Mayor's Order 2022-029, §§ III(1)(a), IV(1), 69 D.C.

Reg. 1,376, 1,378, 1,380 (Feb. 18, 2022).  After both expired, Big Board contacted DC Health on

March 10 to ask whether it could reopen.  Pls.' Ex. C, Emails Between Pls.' Counsel & DC

Health [1-3] 2–3.  DC Health informed Big Board that because its suspension was based on its

refusal to follow now-expired measures, Big Board was cleared for reopening after paying the

$100 reinspection fee, which Big Board did.  *Id.* at 1–2.

### III.    <u>Procedural History</u>

Around the same time Big Board was cleared to reopen, on March 8, Big Board answered

its notices of infraction with a plea of deny, thus starting proceedings before OAH.  Defs.' Ex. A,

Denial 1–2.  An Administrative Law Judge (ALJ) issued a scheduling order setting a hearing

date that did not indicate that there would be any delay in hearing Big Board's case.  Defs.' Ex.

B, Order Scheduling Telephonic Hr'g (Sched. Order).  Prior to the hearing, Big Board filed a

brief stating that it "d[id] not dispute the alleged predicate acts to" the notices of infraction.

Defs.' Ex. C, Resp't Drane Flannery Rest. LLC's Resp. to Notice of Infraction (OAH Resp.) 1.

Accordingly, Big Board declined any evidentiary hearing.  *Id.*  Instead, Big Board argued that

DC Health had no legal authority to issue the infractions.  *Id.*  But Big Board explained that, to

its understanding, OAH "lacks the authority to declare DC Health's actions and the underlying

executive orders unlawful where, as here, the challenger does not dispute the predicate acts of

the offense." *Id.* at 3.

The ALJ concluded that, although Big Board conceded its violations, OAH could not

grant Big Board's preferred relief to "invalidate the D.C. Council's legislation or the Mayoral

Orders."  OAH Order 11.  Nonetheless, OAH relieved Big Board of the fines, reasoning that

D.C. Court of Appeals precedent only allows ALJs to impose fines "if a fine for the violation is listed in a properly promulgated fine schedule," yet the Mayor's orders had not set a schedule. *Id.* at 11–12 (citing *F.W. Woolworth Co. v. D.C. Bd. of Appeals & Rev.*, 579 A.2d 713, 718 (D.C. 1990)).  The ALJ thus dismissed the case but without ordering the $100 inspection fee returned. *Id.* at 12–13.  Big Board could have appealed that outcome directly to the D.C. Court of Appeals, which has statutory authority to "set aside any action . . . found to be" "not in accordance with law," "[c]ontrary to constitutional right," or "[i]n excess of statutory jurisdiction."  D.C. Code § 2-510(a)(3)(A)–(C).  But Big Board declined to seek appellate review.

Instead, days after the ALJ's decision, Big Board sued the District in this Court.  *See* Compl.  Big Board brings four claims: (I) the Council's use of emergency legislation authorizing the Mayor to extend the COVID-19 emergency violated the Home Rule Act and the District Clause (brought as a 42 U.S.C. § 1983 claim); (II) the section of the Public Emergency Act providing that actions taken pursuant to an emergency order are subject to certain DCAPA procedures once the order expires, D.C. Code § 7-2308, violates procedural due process (also brought as a § 1983 claim); (III) DC Health's suspension of Big Board was not authorized by the agency's regulations (brought directly under the DCAPA); and (IV) the Declaratory Judgment Act, 28 U.S.C. § 2201, entitles Big Board to a declaratory judgment.  Compl. ¶¶ 59–78.  Big Board seeks declaratory relief, "[c]ompensatory damages, including the $100 restoration fee," and, "alternatively," nominal damages.  *Id.* ¶¶ 79–83.

## LEGAL STANDARDS

A complaint must be dismissed for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  To survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing jurisdiction.  *See Bronner on Behalf of Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020).  Generally, the Court accepts "well-pled factual allegations" while "disregard[ing] any

legal conclusions, legal contentions couched as factual allegations, and unsupported factual allegations." *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017). If, however, the defendant disputes the complaint's factual allegations, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

A complaint also must be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts need not accept as true conclusory "assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 679, or "legal conclusions," *Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020).

## ARGUMENT

The Court may dismiss Big Board's Complaint in at least three ways. First, although Big Board pleads three federal claims, it really only has one—Count II, alleging a procedural due process violation—and that claim should be dismissed for lack of standing or failure to state a claim, leaving the Court with only District-law claims, for which it should decline jurisdiction. Second, the Court should dismiss for lack of Article III standing because Big Board only alleges past injuries, but those injuries are not traceable to the legal violations Big Board alleges, nor could those injuries be redressed by Big Board's claims. Third, assuming proper jurisdiction, the Complaint simply fails to state a cognizable claim for relief.

**I.    Because Big Board's Claims Are Mostly District-Law Claims and Its One Federal Claim Should Be Dismissed, the Court Should Not Exercise Jurisdiction.**

"A federal court has jurisdiction over substantial federal claims, together with local law claims that are part of a common nucleus of operative fact." *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 362 (D.C. Cir. 2007). Big Board invokes this Court's jurisdiction by bringing three supposedly federal claims. But the Court must first assure itself that those claims are indeed cognizable under federal law. *DCACPS*, 930 F.3d at 490. Two are not: the Declaratory Judgment Act claim and the Home Rule Act claim. The third (procedural due process) can be dismissed for lack of standing or failure to state a claim. With only District-law claims remaining, the Court should decline to exercise supplemental jurisdiction. *See Araya v. J.P. Morgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (explaining that a court should dismiss District-law claims once the only federal claim has been dismissed (citing 28 U.S.C. § 1367)).

**A.    The Declaratory Judgment Act Claim Is Not Cognizable.**

Big Board brings a standalone claim under the Declaratory Judgment Act. Compl. ¶¶ 76–78. But that Act is a "procedural" statute in which Congress "enlarged the range of remedies available in the federal courts" for already cognizable claims. *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). As such, it does not "provide a cause of action" and "is not an independent source of federal jurisdiction." *Id.* (internal quotation marks and citation omitted). Thus, a standalone Declaratory Judgment Act claim "must be dismissed for lack of subject matter jurisdiction." *Hassan v. Holder*, 793 F. Supp. 2d 440, 446 (D.D.C. 2011) (Berman Jackson, J.).

13

**B.      The Home Rule Act Claim Is Not Cognizable Under § 1983 and, in Any Event, Is a District-Law Claim.**

Big Board brings, via 42 U.S.C. § 1983, a claim for violations of the Home Rule Act (Count I).[5]  But § 1983 is not a vehicle for Home Rule Act violations, so it can be dismissed. Regardless, that claim is not federal.

**1.      Big Board Cannot Assert a § 1983 Claim for Alleged Violations of the Home Rule Act.**

Section 1983 does not provide a remedy for Big Board's alleged Home Rule Act violations.  Section 1983 provides a remedy for the deprivation of federal statutory and constitutional rights.  But "it is only violations of *rights*, not *laws*, which give rise to § 1983 actions." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  Those rights must be "unambiguously conferred" by the statute.  *Id.*  For the Home Rule Act's emergency-legislation provisions to confer a right enforceable by § 1983, their text must clearly reveal an intent to confer individual rights on a class of persons including Big Board.  *Id.* at 283–84.

The Home Rule Act, however, contains no "'rights-creating' language critical to showing the requisite congressional intent." *Gonzaga*, 546 U.S. at 287 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001)).  The emergency legislation provisions refer mainly to the Council and outline its powers to enact emergency legislation and the process it must follow.  D.C. Code §§ 1-204.12(a), 1-206.02(c)(1).  The provisions, then, "serve primarily to direct" the Council's exercise of legislative power, rather than confer individual rights.  *Gonzaga*, 546 U.S. at 290.

---

[5]      Big Board alleges in Count I that the Council's "series" of emergency legislation violated the Home Rule Act and District Clause.  Compl. ¶ 61.  Any violation of the District Clause is subsumed into any alleged Home Rule Act violation because the Home Rule Act represents Congress's exercise of its power under the District Clause.  *See DCACPS*, 930 F.3d at 490, 493.  Big Board does not allege otherwise.  Accordingly, this brief refers to the Home Rule Act when discussing Count I.

There is *no* mention of individuals (besides government actors) or classes of beneficiaries, and certainly not businesses like Big Board.

Even if there were rights-creating language, "Congress 'specifically foreclosed a remedy under § 1983'" for violations of the Home Rule Act provisions here. *Id.* at 283 n.4 (quoting *Smith v. Robinson*, 468 U.S. 992, 1004–05 n.9 (1984)). That is so because Congress provided its own "enforcement scheme" under the Home Rule Act for the Council's misuse of legislative power as Big Board alleges. *Id.* (internal quotation marks omitted) (quoting *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)). Congress, while granting the Council legislative power, "reserve[d] the right" to legislate for the District and to repeal "any law" of the Council. D.C. Code § 1-206.01. Congress thus tasked itself with enforcing the Home Rule Act against the Council—not private parties through litigation.

To claim otherwise, Big Board invokes *Bliley v. Kelly*, 23 F.3d 507 (D.C. Cir. 1994), Compl. ¶ 60, but *Bliley* just shows why Big Board cannot bring a § 1983 claim here. In *Bliley*, members of Congress sued the District under § 1983, claiming that an act of the Council was invalid because its congressional review period had been suspended by subsequent acts, so the Home Rule Act required resubmission to Congress. 23 F.3d at 510. The D.C. Circuit explained that the members stated a § 1983 claim because the Home Rule Act "confers a right of participation on Congress." *Id.* at 511. The Court further explained that the members' injury "is not that they will be harmed if the [Council's legislation] becomes law; it is that such an occurrence would deprive them of their right, as members of Congress, to review the [legislation] before it becomes law." *Id.* at 510.

*Bliley* is inapplicable here because Big Board is not a member of Congress so it cannot assert the "right of participation [conferred] on Congress" by the Home Rule Act. *Id.* at 511.

Furthermore, the injury Big Board asserts is that it was harmed by the substance of the emergency acts when they became law, not that the Council's legislative process directly harmed it. *See id.* at 510. And *Bliley* has never been cited by the D.C. Circuit for the broad proposition that any Home Rule Act violation is cognizable under § 1983. To the contrary, in the D.C. Circuit's only subsequent discussion of *Bliley*, the Court emphasized that *Bliley* was unique because it was brought by members of Congress. *Noble v. U.S. Parole Comm'n*, 82 F.3d 1108, 1113 (D.C. Cir. 1996).

In fact, precedent forecloses Big Board's interpretation of *Bliley*. For one, since before *Bliley*, the D.C. Circuit has held that various claims asserting violations of the Home Rule Act were not federal claims because the relevant provisions of the Act were properly characterized as District, not federal, law (explained further below). *E.g.*, *Dimond v. District of Columbia*, 792 F.2d 179, 188 (D.C. Cir. 1986); *DCACPS*, 930 F.3d at 492. Big Board's position, if adopted, would render that long line of precedent wrongly decided because all those claims should have been cognizable as federal claims under § 1983. For another, *Bliley* recognized a right without engaging in the demanding textual analysis the Supreme Court has since required. *Compare Bliley*, 23 F.3d at 510, *with Gonzaga*, 536 U.S. at 283 ("We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983."). Whatever limited relevance *Bliley* retains (the D.C. Circuit has not cited it since the Supreme Court decided *Gonzaga*), it does not apply here.

## 2. Even if Brought Directly Under the Home Rule Act, Big Board's Claim Is a District-Law Claim.

Because Big Board brings its Home Rule Act claim solely as a § 1983 claim, the Court may dismiss Count I outright for the reasons above. But even if Big Board had brought Count I as a direct claim under the Home Rule Act, it still is not a federal claim. Federal courts have

jurisdiction over "actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. But "laws of the United States or Acts of Congress do not include laws applicable exclusively to the District of Columbia." *Id.* § 1366. Applying this distinction, the D.C. Circuit has explained that "[t]he Home Rule Act is a hybrid statute, in that while certain of its provisions apply exclusively to the District of Columbia, others do not." *DCACPS*, 930 F.3d at 492 (internal quotation marks and citations omitted). "[T]o determine whether a particular claim asserted under the Act falls within federal-question jurisdiction, we must assess whether the specific provision at issue is federal or local in character." *Id.* If the provision "limits the District's authority," "imposes a constraint only on the District's power to legislate," or has no "effect . . . beyond the compass of the District," then the provision is not federal. *Id.* at 492–93. Examples include sections providing that the Council cannot amend or repeal acts of Congress that apply to the District, cannot enact any legislation relating to courts, and must read legislation twice before passage. *Id.* at 493 (citing D.C. Code § 1-206.02(a)(3)); *Dimond*, 792 F.2d at 188 (citing D.C. Code § 1-206.02(a)(4), (8)); *Decatur Liquors*, 478 F.3d at 363 (citing D.C. Code § 1-204.12(a)). Like those examples, the emergency legislation provisions at issue here limit the Council's "legislative authority," so they "apply exclusively to the District." *DCACPS*, 930 F.3d at 493. In other words, they prescribe the Council's legislative process, so Big Board's claim that the Council abused that process is a claim for a violation of District law, falling outside this Court's jurisdiction.

*Bliley* is not to the contrary. There, the issue was whether later acts submitted by the Council to Congress suspended the congressional review period for an earlier act. 23 F.3d at 509–11. That is, the Court addressed when the congressional review period for an act began and ended to determine whether members of Congress could demand resubmission. *Id.* at 512–13.

The Court explained that those "questions regarding Congress's reserved right to review District legislation before it becomes law concerns an exclusively federal aspect of the Act." *Id.* at 511. Unlike in *Bliley*, the issue here is not the length of any congressional review period. The issue is whether the Council properly used emergency legislation (an issue absent in *Bliley*). Put another way, *Bliley* was about Congress's powers, and this case is about the Council's powers. The former has a federal character, while the latter has a District character.[6] Big Board's Home Rule Act claim therefore does not present a federal question.

### C.    The Court Should Dismiss the Procedural Due Process Claim and Decline to Exercise Supplemental Jurisdiction.

Dismissing the Declaratory Judgment Act claim and unmasking the Home Rule Act claim leaves procedural due process as Big Board's only possible federal claim. As explained below, that claim can be dismissed for lack of standing, *see* Argument § II.B.2, *infra*, or failure to state a claim, *see* Argument § III.B, *infra*. Once dismissed, the Court should decline to exercise supplemental jurisdiction over the remaining District-law claims (the Home Rule Act claim and the DCAPA claim). *See* 28 U.S.C. § 1367(c)(3) (stating that dismissing state-law claims is appropriate if "the district court has dismissed all claims over which it has original jurisdiction"); *Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 65 (D.D.C. 2019) (Berman Jackson, J.) (dismissing sole federal claim for failure to state a claim, then declining to exercise supplemental jurisdiction), *aff'd*, 801 F. App'x 780 (D.C. Cir. 2020) (per curiam). Supplemental jurisdiction is especially inappropriate here because the Home Rule Act and DCAPA claims raise "novel or complex" issues of District law. 28 U.S.C. § 1367(c)(1). For example, the D.C.

---

[6]    The above also confirms that Big Board cannot bring a § 1983 claim. As explained, Big Board's alleged violations of Home Rule Act are alleged violations of District law. But § 1983 only provides relief for violations of federal—not state—law. *Vega v. Tekoh*, 142 S. Ct. 2095, 2106 (2022); *Ladeairous v. Sessions*, 884 F.3d 1172, 1174–75 (D.C. Cir. 2018).

Court of Appeals has not addressed the legislation at issue here or claims arising from DC

Health's suspension of licenses for violations of emergency orders.  In such cases, a federal court

should leave the District-law claims to the D.C. Superior Court.  *Araya*, 775 F.3d at 418.

## II.    <u>Big Board Lacks Standing.</u>

The Complaint should also be dismissed because Big Board lacks standing.  *See*

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal

court has leeway 'to choose among threshold grounds for denying audience to a case on the

merits.'" (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999))).  "A plaintiff

has standing only if he can 'allege personal injury fairly traceable to the defendant's allegedly

unlawful conduct and likely to be redressed by the requested relief.'" *California v. Texas*, 141 S.

Ct. 2104, 2113 (2021) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)).  A

plaintiff "must establish standing 'for each claim [it] seeks to press and for each form of relief

that is sought.'" *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir.

2022) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).  Here, Big Board has allegedly faced

only past injuries (and minor ones at that), which dooms its requests for declaratory relief.  And

those past injuries are not sufficiently traceable to or redressable by the claims Big Board brings.

### A.    <u>Big Board Only Alleges Past Injuries, So It Lacks Standing to Seek Declaratory Relief.</u>

Besides damages, Big Board seeks declaratory relief, Compl. ¶¶ 79–83, but alleges past

injuries—which do not confer standing for such relief, *Dearth v. Holder*, 641 F.3d 499, 501

(D.C. Cir. 2011).[7]  Big Board faced a short suspension that ended one year ago.  Compl. ¶¶ 34–

---

[7]    Although plaintiffs who suffered past injuries have standing to pursue claims for
damages, the damages Big Board seeks are next to nothing.  Big Board "seek[s] declaratory
relief" and "costs or fees assessed by DC Health."  Compl. ¶ 7.  But Big Board never had to pay

42.  The legal authority challenged by Big Board supporting that suspension has expired.  *See*

Mayor's Order 2022-029, §§ III(1)(a), IV(1), 69 D.C. Reg. at 1,378, 1,380; Jan. 6, 2022

Emergency Act, 69 D.C. Reg. at 214.  And both the suspension and legal authority expired

*before* Big Board filed its Complaint.  That means Big Board has only alleged a past, completed

injury (its suspension) caused by expired laws, and such injuries cannot support declaratory

judgment claims.  *Dearth*, 641 F.3d at 501; *Diffenderfer v. Cent. Baptist Church of Miami, Fla.,*

*Inc.*, 404 U.S. 412, 414–15 (1972) (per curiam) (Declaratory relief "is of course, inappropriate

now that the statute has been repealed."); *O'Gilvie v. Corp. for Nat'l Cmty. Serv.*, 802 F. Supp.

2d 77, 81 (D.D.C. 2011) (Berman Jackson, J.) (no standing to challenge debarment that expired

before suit commenced).

Nor has Big Board alleged that it is "suffering an ongoing injury or faces an immediate

threat of injury."  *Dearth*, 641 F.3d at 501.  There is no Mayor order or emergency legislation

currently in place or even proposed that could be enforced against Big Board.  *See California*,

141 S. Ct. at 2114 ("[O]ur cases have consistently spoken of the need to assert an injury that is

the result of a statute's actual or threatened *enforcement* . . . .").  Contrary to Big Board's

allegation, Compl. ¶ 52, the Public Emergency Act currently allows the Mayor to extend an

emergency only for 15 days, D.C. Code § 7-2306(b).

---

any costs or fees besides the reinspection fee.  *See* OAH Order 11–12.  True, elsewhere Big
Board alleges that it "suffered other damages as a result of the Summary Suspension" and
"[c]ompensatory damages."  Compl. ¶¶ 37, 82.  Such a bare allegation without any facts even
hinting at what monetary injuries Big Board faced is insufficient.  *See Foodbuy, LLC v. Gregory*
*Packaging, Inc.*, 987 F.3d 102, 116 (4th Cir. 2021) (holding that a plaintiff lacked standing when
his theory of monetary injury was not supported by factual allegations in the complaint).  And
although Big Board also seeks punitive damages, Compl. ¶ 82, "the District generally cannot be
liable for punitive damages," *Jefferies v. District of Columbia*, 917 F. Supp. 2d 10, 30 (D.D.C.
2013) (collecting cases).

The only way Big Board tries to make this case about something more than a completed suspension and expired laws is to suggest that the issues here are capable of repetition yet evading review.  Compl. ¶¶ 53–55.  That is an exception to mootness, but "[s]tanding admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).  Even if the exception had some relevance here, it requires Big Board to show, among other things, "a reasonable expectation that the same complaining party will be subjected to the same action again."  *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018) (internal quotation marks omitted) (quoting *Turner v. Rogers*, 564 U.S. 431, 439–440 (2011)).  That showing here depends on a speculative chain of events: (1) the pandemic will reach Omicron levels, (2) the Council will pass identical legislation as before, (3) the Mayor will issue emergency orders, (4) the Mayor will impose the same mask and proof-of-vaccination requirements, (5) Big Board will violate them, and (6) DC Health will suspend Big Board.  That is too tenuous to support Article III jurisdiction.  *See Beethoven.com LLC v. Libr. of Cong.*, 394 F.3d 939, 951 (D.C. Cir. 2005) (requiring the same "particular agency policies, regulations, guidelines, or recurrent identical agency actions" (internal quotation marks omitted) (quoting *Pub. Utils. Comm'n of Cal. v. FERC*, 236 F.3d 708, 714–15 (D.C. Cir. 2001))); *County of Butler v. Governor of Pa.*, 8 F.4th 226, 232 (3d Cir. 2021) (mootness exception did not apply in challenge to expired COVID-19 orders).

To allege otherwise, the Complaint cites *District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d 1349 (D.C. 1980) (en banc), for the proposition that whether the Council had the power to enact "successive" emergency legislation is an issue capable of

repetition yet evading review.  Compl. ¶ 53.  *Washington Home* is unavailing for three reasons.

First, Article III standing and mootness are questions of federal law, *Laidlaw*, 528 U.S. at 180, so

this Court is not bound by the D.C. Court of Appeals' determination of such questions, *Bliley*, 23

F.3d at 511.  Second, the *Washington Home* court applied the exception because emergency

legislation was in place when the suit started, 415 A.2d at 1350 n.3, but, as explained, the

Mayor's orders and underlying emergency legislation here expired before Big Board filed its

Complaint.  Third, "[r]esolution of the mootness question requires attention to the particular

circumstances of the case."  *Hawse v. Page*, 7 F.4th 685, 692 (8th Cir. 2021) (challenge to

COVID-19 orders).  In *Washington Home*, the court found that the Council was likely to again

enact similar emergency legislation imposing a moratorium on converting rental properties to

condominiums because the legislation addressed a general problem (affordable housing), and the

plaintiff (a developer) would certainly be subject to such legislation.  *See* 415 A.2d at 1350 n.3,

1353.  Yet, the Council's likely approach to an ever-evolving pandemic is subject to far more

contingencies, thus making predictions about similar, future responses too speculative.  *E.g.*,

*County of Butler*, 8 F.4th at 232.  Plus, unlike in *Washington Home*, other contingences abound

regarding whether Big Board would be affected, such as whether the Mayor would impose

similar safety measures and whether Big Board would violate them and be disciplined again.

This is not a scenario, then, where the exception applies.

### B.    Big Board's Past Injuries Do Not Confer Standing to Pursue Its Claims.

These past injuries were either not caused by the legal violations Big Board alleges or

could not be redressed through the claims it pursues.

### 1.    Home Rule Act

Big Board lacks standing to pursue its Home Rule Act claim because the alleged

violation of the Act is too attenuated from Big Board's injury.  *Dimond v. District of Columbia*,

792 F.2d 179, shows why.  There, a plaintiff who was injured in a car accident challenged a

District law that restricted accident victims' recovery of costs.  792 F.2d at 182–84.  He alleged

that the law was invalid because the Council violated the Home Rule Act by failing to read the

legislation twice before passage.  *Id.* at 190.  But the D.C. Circuit held that he lacked standing

because "his injury from the substantive provisions" of the law was too attenuated from the

Council's "procedural violations" of the Home Rule Act.  *Id.* at 191.  For example, he had not

"claimed that the substantive *content* of the statute might have been different had the required

procedures been observed."  *Id* (emphasis in original).  Instead, the "potential connection"

between his injuries flowing from the content of the legislation and how the legislation was

adopted was "unduly speculative."  *Id.*

      The connection in this case between injury and alleged violation is likewise too shaky.

Like in *Dimond*, Big Board alleges a procedural violation under the Home Rule Act: the Council

should have submitted its COVID-19 emergency legislation to Congress for review.  Compl.

¶ 61.  And like in *Dimond*, Big Board does not plausibly allege that correction of this purported

procedural error would have prevented the legislation from being enacted or changed its content.

Nor could Big Board make out such a theory because, as explained further below, Congress *did*

review Council legislation responding to COVID-19 and never disapproved it.  *See* Argument

§ III.A, *infra*.

      In fact, the connection between Big Board's injury and the alleged Home Rule Act

violation here is even weaker than in *Dimond*.  There, the plaintiff was directly regulated by the

substantive provisions of the legislation, which limited his eligibility to recover certain losses

from his accident.  792 F.2d at 190.  Big Board, by contrast, is many more steps removed from

the legislation it challenges.  The legislation only authorized the Mayor to extend the emergency,

so unlike in *Dimond*, the legislation did not act directly upon Big Board.  Instead, Big Board was further downstream: once authorized, the Mayor extended the emergency; the Mayor then issued safety measures to respond to that emergency; Big Board then violated those measures; and finally, DC Health suspended Big Board's license.  That suspension is too far removed from the alleged procedural violation of the Home Rule Act to confer standing.

Laying out the chain of events between the action Big Board challenges and the injury it alleges reveals another fatal "problem" for Big Board: "the presence of intervening factors that influence both traceability and redressability."  *Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991).  That is, the Mayor's mask and proof-of-vaccination orders did not depend solely on the allegedly invalid emergency legislation as their source of authority.  Rather, those orders were independently supported by other sources of law that Big Board does not challenge.  For one, the Mayor has authority to, consistent with the DCAPA, "issue rules to prevent and control the spread of communicable diseases," D.C. Code § 7-131(a), which the orders here cited, Mayor's Order 2021-148 at 1, 68 D.C. Reg. at 14,222; Mayor's Order 2021-147 at 1, 68 D.C. Reg. at 13,954.  Although the DCAPA usually requires notice-and-comment rulemaking, the Mayor may adopt a rule "immediately" "in an emergency, as determined by the Mayor."  D.C. Code § 2-505(c).  The orders here so qualify.  For another, temporary legislation that *was* subject to congressional review authorized the Mayor to extend the emergency and take emergency measures through March 2022.  69 D.C. Reg. at 599, 2,372.  Finally, the Mayor has the general power "to issue and enforce administrative orders, not inconsistent with [the Home Rule Act] or

any other Act of the Congress or any act of the Council, as are necessary to carry out [her] functions and duties."  D.C. Code § 1-204.22(11).[8]

    This separate authority means that even if Big Board were correct that the Council's emergency legislation authorizing the Mayor to extend the emergency violated the Home Rule Act, its suspension was not caused by that violation and could not be redressed by a judgment that a violation occurred.  *See California*, 141 S. Ct. at 2119–20 (plaintiffs lacked standing to challenge one statutory provision when their alleged injuries stemmed from other provisions).  In terms of causation, Big Board's suspension was independently caused by the Mayor's exercise of her powers under at least three other sources of law besides any emergency act.  So, if that act had never passed, Big Board's suspension still could have occurred.  In terms of redressability, if the Court were to determine that emergency legislation was invalid and so could not support the Mayor's orders, it would not render the suspension unlawful or entitle Big Board to recover losses from it.  Instead, the Mayor's orders and Big Board's suspension for violating them would still be lawful based on other sources of authority.  "[D]eclaring" the Mayor's orders and suspension "illegal" under the Home Rule Act alone "would accomplish nothing—amounting to exactly the type of advisory opinion Article III prohibits."  *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008)).

    At the least, Big Board lacks standing to challenge earlier emergency legislation that was not part of the above-described chain at all.  Big Board broadly challenges the authority of the Council to pass "a series" of emergency legislation and the authority of the Mayor to issue

---

[8]    The Court may find that these other sources of authority go more to the merits of whether the suspension here was "*ultra vires*," Compl. ¶ 62, than standing.  Either way, Big Board's Home Rule Act claim should be dismissed.

"rolling" emergency executive orders in succession.  Compl. ¶ 61.  But Big Board's purported

injuries occurred on February 1 and 7, 2022 when only one set of emergency enactments was in

place: the January 6, 2021 Emergency Act, Mayor's Order 2022-007 (extending the emergency),

and the mask and proof-of-vaccination requirements.  *See* Compl. ¶¶ 34–41.  Big Board was not

affected by any legislation or Mayor's orders not in place at that time.  As a result, Big Board

lacks standing to challenge them.

### 2.    Procedural Due Process

Big Board lacks standing to challenge D.C. Code § 7-2308 as a violation of procedural

due process because that statute was never applied to Big Board.  To challenge a statutory

provision, Big Board must show that the government enforced that provision against Big Board.

*California*, 141 S. Ct. at 2114.  Yet, although D.C. Code § 7-2308 provides that contested case

procedures may be delayed during an emergency, Big Board received the normal contested case

process, as the record plainly reveals.  *See* 1st Not. 8; Sched. Order.  By requiring an answer

within 15 days, the infraction notices issued to Big Board conveyed that OAH proceedings

would operate on the usual schedule, and commencement was not dependent on expiration of the

emergency orders.  1st Not. 8; *see* D.C. Code § 48-108.01(h) ("A [food establishment] licensee,

person in charge, or employee shall have the right to request a hearing within 15 days after

service of the notice of an adverse action . . . .").  Further, following receipt of Big Board's plea,

the ALJ scheduled a hearing for the following month without any indication that the hearing date

depended on the expiration of Mayor's orders or the declared emergency.  Sched. Order; *see also*

1st Not. 8 (stating that, upon receipt of an answer, "[a] hearing will be scheduled").  There is

simply no mention in any documents from DC Health or OAH of D.C. Code § 7-2308.  Indeed,

the Complaint never alleges that DC Health or OAH indicated to Big Board any intent to enforce

the statute.

Nor was there even an opportunity for DC Health or OAH to enforce D.C. Code § 7-2308 in Big Board's case.  Big Board did not start its proceedings until March 8, 2022—*after* the Mayor's mask and proof-of-vaccination requirements expired.  *See* Background §§ II, III, *supra*; Denial 1–2.  Any delay in Big Board's administrative proceeding was thus caused by Big Board, not D.C. Code § 7-2308 or any District agency acting pursuant to the statute.  And because Section 7-2308 was never enforced against Big Board, Big Board cannot challenge the statute. *See, e.g.*, *Hightower v. City of Boston*, 693 F.3d 61, 70 (1st Cir. 2012) (no standing to challenge licensing statute's procedures when the plaintiff had never applied for a license); *S. Blasting Servs., Inc. v. Wilkes County*, 288 F.3d 584, 595 (4th Cir. 2002) (similar).

### 3.    DCAPA

Big Board lacks standing to bring a DCAPA claim regarding DC Health's regulatory authority because such a claim cannot redress its past injuries.  As a threshold matter, the DCAPA does not provide a cause of action, but plaintiffs may bring a suit in equity to prevent unlawful District agency actions.  *Sanchez*, 45 F.4th at 402 (citing *District of Columbia v. Sierra Club*, 670 A.2d 354, 359 (D.C. 1996)).  So Big Board's "DCAPA claim" is really such a suit. *See Sierra Club*, 670 A.2d at 358.  But an equitable relief action requires present or future injury—which Big Board does not have, as explained above.  *Dearth*, 641 F.3d at 501. Moreover, besides declaratory relief, Big Board seeks only damages, Compl. ¶ 82, but damages are not recoverable through an equitable claim.  Because a DCAPA claim could not provide the redress Big Board seeks, Big Board lacks standing to pursue Count III.  *See, e.g.*, *Abulhawa v. Dep't of Treasury*, No. 17-5158, 2018 WL 3446699, at *3 (D.C. Cir. June 19, 2018) (per curiam) ("[T]he redressability requirement closes the door on [plaintiffs'] claims for already-lost property because damages are not available under the [federal] APA."); *Gore v. Wilkie*, No. 19-cv-1134, 2020 WL 2838662, at *5 (D.D.C. May 31, 2020) (same).

III.    **The Complaint Fails to State a Claim.**

If the Court reaches the merits, each claim fails for several reasons.[9]

A.    **The Home Rule Act Claim Fails.**

There was no violation of the Home Rule Act with the Council's emergency legislation in response to COVID-19.  Judicial review of the Council's use of emergency legislation is limited: Courts "owe 'substantial deference' to the Council's determination that emergency circumstances exist, and 'seek only to assure [them]selves that [an emergency] act is facially valid, i.e., consistent with Council legislative authority in partnership with Congress.'" *Pub. Media Lab*, 276 A.3d at 8 (quoting *Am. Fed'n of Gov't Emps. v. Barry*, 459 A.2d 1045, 1051 (D.C. 1983)).  Indisputably, there was a facially valid emergency supporting the Council's legislation authorizing the Mayor to extend her emergency orders—the pandemic.  *See* Res. 24-337, 68 D.C. Reg. at 14,109.  Indeed, when the Council passed the emergency legislation applicable here in late December 2021, COVID-19 cases and deaths were rapidly rising due to the Omicron wave.  *See* note 1, *supra* (select "The United States" and "Weekly Cases" or "Weekly Deaths").  Big Board cannot seriously contend that the Council did not face "a situation that adversely affects the health, safety, welfare, or economic well-being of the District."  *Pub. Media Lab*, 276 A.3d at 7 (internal quotation marks and citation omitted).

---

[9]    Even if any claim survives, the Big Board has sued incorrect defendants.  The Complaint names DC Health as one defendant, Compl. ¶ 10, but subordinate District agencies, like DC Health, are not suable entities, *Kane v. District of Columbia*, 180 A.3d 1073, 1078 (D.C. 2018); *see also Nix El v. Williams*, 174 F. Supp. 3d 87, 93 (D.D.C. 2016) (dismissing DC Health). Additionally, Interim DC Health Director Dr. Sharon Lewis, who replaces original official capacity defendant Dr. LaQuandra Nesbitt by operation of Rule 25(d), should be dismissed as redundant once the District is substituted for DC Health.  *See, e.g.*, *Lattisaw v. District of Columbia*, 118 F. Supp. 3d 142, 152–53 (D.D.C. 2015), *aff'd*, 672 F. App'x 22 (D.C. Cir. 2016) (per curiam).

In rare circumstances, the D.C. Court of Appeals has looked beyond "the Council's 'emergency' determination on the ground that it was in reality 'an attempt by the Council to avoid congressional review.'"  *Id.* at 8 (quoting *Alston*, 580 A.2d at 595).  But the legislative record dispels any notion that the Council was intentionally avoiding congressional review here. Throughout the pandemic, the Council submitted legislation to Congress authorizing the Mayor to extend the COVID-19 emergency and respond to COVID-19.  *See* App'x A.  Most relevant here, the Council passed identical emergency and temporary legislation authorizing the Mayor to extend the COVID-19 emergency through March 17, 2022, the period covering the events in this case.  Jan. 6, 2022 Emergency Act, 69 D.C. Reg. at 214; D.C. Act 24-292, 69 D.C. Reg. at 599; D.C. Law 24-102, 69 D.C. Reg. at 2,372.  The temporary legislation received congressional review without disapproval.  Thus, Big Board's claim that the Council and Mayor "thwarted" Congress's review, Compl. ¶ 61, is wrong.

Indeed, the D.C. Court of Appeals has indicated that, by using temporary legislation, the Council satisfies the Home Rule Act's congressional review requirement—even if the Council simultaneously legislates with successive emergency legislation.  As noted, before the advent of temporary legislation, the court in *Washington Home* disapproved of the Council's use of successive, similar emergency legislation to respond to a general, long-term problem (a housing crisis).  415 A.2d at 1359.  But later, in *Alston*, the court clarified that "*Washington Home* did not hold that the Home Rule Act prohibited the Council from enacting a consecutive, substantially identical emergency act under all circumstances."  580 A.2d at 594.  The main problem in *Washington Home*, the *Alston* court explained, was that "the Council had adopted numerous successive emergency acts without passage of any similar legislation subject to congressional review."  *Id.* at 598.  But the Council devised the temporary legislation process in response and

thereby solved the problem presented in *Washington Home*. *Id.* Indeed, the D.C. Court of Appeals recently emphasized that since the advent of temporary legislation, the court has not invalidated emergency legislation when accompanied by temporary legislation. *Pub. Media Lab*, 276 A.3d at 8. Simply put, the Council here could not have run afoul of *Washington Home* because it followed the process endorsed post-*Washington Home* by *Alston*, reaffirmed in *Public Media Lab*.

Even without temporary legislation, the Council's approach to the pandemic was not inconsistent with *Washington Home*. There, the D.C. Court of Appeals was concerned that the Council was responding to an unchanging, ongoing emergency, 415 A.2d at 1353, with a chain of emergency legislation as an "alternative legislative track" to permanent legislation, *id.* at 1359. That is, the relatively stable nature of the emergency at issue meant that it could have reasonably been mitigated through the ordinary legislative process. *See id.* at 1356–57. COVID-19 is different. The pandemic was constantly evolving, with case rates, deaths, variant prevalence, etc. changing day-by-day. As a result, especially during the period at issue, the pandemic necessitated a step-by-step approach where the Council would authorize extensions of the emergency for a short period, and if the pandemic persisted, authorize an additional extension. Although the pandemic continued for many months, the Council could not have foreseen when the pandemic would subside at any point such that permanent legislation would have been appropriate. *Cf. Atchison v. District of Columbia*, 585 A.2d 150, 156 n.8 (D.C. 1991) (emergency legislation may be invalid under *Washington Home* if it "functions as permanent legislation"). Indeed, Big Board's criticism of the Council is curious because the alternative to the Council's approach would have been to give the Mayor unlimited authority on a permanent basis to extend the emergency. That cannot be right. But moreover, this was simply not the

situation envisioned by the D.C. Court of Appeals in *Washington Home*.  If there ever were a case for successive emergency legislation, it was the pandemic.

In sum, the question for Big Board's Home Rule Act claim is whether the Council tried to skirt congressional review.  *Pub. Media Lab*, 276 A.3d at 8.  It did not.  The Council's COVID-19 response was constantly subjected to congressional review without disapproval.  Nor did Congress ever exercise its power to repeal or amend the Council's COVID-19 legislation despite legislating extensively itself to address COVID-19.  *See* D.C. Code § 1-206.01.  In fact, Congress did quite the opposite:  It legislated to fund the District's COVID-19 response efforts.  *E.g.*, American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 3206(c), (d)(3)(A), 135 Stat. 4, 64–65 (establishing that the District shall receive, at a minimum, $50 million to mitigate housing financial hardships associated with the pandemic).

Even if Big Board's claim presented a closer call (and it does not), this Court—as a federal tribunal applying District law—should only invalidate the Council's legislation and Mayor's orders when the D.C. Court of Appeals clearly would do so.  *See Daskalea v. District of Columbia*, 227 F.3d 433, 447 (D.C. Cir. 2000) ("Because our role in deciding a pendent District of Columbia claim is only to ascertain what District law is, not what it ought to be, we are unable to do for [the plaintiff] what the D.C. Court of Appeals has never done for any plaintiff." (internal quotation marks and citation omitted)).  Yet, that court has "consistently reiterated [its] deferential approach" to reviewing emergency legislation, "particularly where the emergency legislation is (as it was here) accompanied by proposed temporary legislation."  *Pub. Media Lab*, 276 A.3d at 8.  That court has also reviewed COVID-19 emergency and temporary legislation without remark of any Home Rule Act defect.  *Towers I*, 250 A.3d at 1051; *District of Columbia*

*v. Towers* (*Towers II*), 260 A.3d 690, 692 (D.C. 2021). There is none here, so Count I fails to state a claim.

      **B.**    **The Procedural Due Process Claim Fails.**

      Big Board alleges that D.C. Code § 7-2308, which postpones formal adjudications arising from emergency orders until the order expires, deprived Big Board of judicial review in violation of procedural due process. Compl. ¶¶ 66–71. Even if the statute had been applied here, Big Board's claim fails for three reasons.

      First, Big Board is wrong to say that the statute barred or delayed judicial review of the Mayor's orders or DC Health's enforcement actions because other procedures were available to challenge them both. *See N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 168 (2d Cir. 2001) (rejecting due process claim arising from extended delay in administrative proceedings due to "the availability of other procedures that could have prevented the claimants from suffering prejudicial delay"); *Chavis v. Garrett*, 419 F. Supp. 3d 24, 38 (D.D.C. 2019) (collecting cases from this Court applying *Pataki*). For one, assuming Big Board could otherwise establish standing, it could have brought federal claims in this Court to challenge the Mayor's orders. *Sullivan v. Murphy*, 478 F.2d 938, 963 (D.C. Cir. 1973). D.C. Code § 7-2308 would have posed no bar to a pre-enforcement challenge because no contested case would have yet arisen. Even post-suspension, Big Board could have filed in federal court so long as it could prove up its theory regarding the unavailability of administrative remedies. *Sullivan*, 478 F.2d at 963; *see also BEG Invs., LLC v. Alberti*, 34 F. Supp. 3d 68, 77 (D.D.C. 2014) (excusing exhaustion after concluding that the DCAPA's contested case procedure could not provide the plaintiff the relief he sought from his constitutional claims); *Hodges v. Gov't of D.C.*, 975 F. Supp. 2d 33, 44–45 (D.D.C. 2013) (Berman Jackson, J.) (similar). And, in any event, Big Board could have filed an equitable action under local law in local court. *Sanchez*, 45 F.4th at 402; *Sierra Club*, 670 A.2d

at 357, 359; *see also, e.g.*, Compl., *Overby v. District of Columbia*, No. 2021 CA 001555 B

(D.C. Super. Ct. May 11, 2021) (DCAPA challenge to District agency's denial of fireworks

permits due to public emergency).  Again, Big Board did not pursue any of these avenues.

Second, Big Board cannot show prejudice.  *See Estes v. Texas*, 381 U.S. 532, 542 (1965)

("[I]n most cases involving claims of due process deprivations we require a showing of

identifiable prejudice . . . ."); *Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d 441, 446 (D.C.

Cir. 1992) (finding no due process violation where plaintiff failed to show prejudice).  Big Board

does not contend that the result here would have been different had its proceedings commenced

any earlier.  To the contrary, Big Board *admitted* that it violated the Mayor's orders.  OAH Resp.

1.  On top of that, Big Board delayed in availing itself of the procedures available at OAH and,

as noted, did not seek review in any readily available judicial forum.  "The fact that [Big Board]

failed to avail [it]self of the full procedures provided by [District] law does not constitute a sign

of their inadequacy."  *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 485 (1982); *see also Long

v. District of Columbia*, 194 F.3d 174 (Table) (D.C. Cir. 1999) (per curiam) (procedural due

process claim failed when plaintiff failed to seek available judicial review of District agency's

decision).[10]

Third, and in any event, D.C. Code § 7-2308 complies with due process, on its face and

had it been applied here.  The statute does not "deprive" anyone of judicial review, it merely

---

[10]     In most cases—and certainly this one—D.C. Code § 7-2308 will have no prejudicial
effect on the promptness of *judicial* review.  In the typical contested case, parties do not reach
the Court of Appeals quickly.  *See, e.g.*, D.C. Cts., *Statistical Summary* 3 (2021),
https://tinyurl.com/22tdmhdp (listing median time on appeal for cases before the D.C. Court of
Appeals as around one year).  Section 7-2308 just pushes that timeline's start date until the
underling order expires—usually no more than 15 days.  D.C. Code § 7-2306(a).  And the orders
underlying Big Board's suspension expired two and four weeks after its first notice.  *See* 1st Not.
1; Mayor's Order 2022-029 §§ III(1)(a), IV(1), 69 D.C. Reg. at 1,378, 1,380.

postpones the commencement of formal agency adjudication procedures.  As the Supreme Court explained nearly a century ago, "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate." *Phillips v. C.I.R.*, 283 U.S. 589, 595–96 (1931).  Moreover, "[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action.  Indeed, deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981) (quoting *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599 (1950)).  Accordingly, D.C. Code § 7-2308 and license suspensions for violations of COVID-19 measures followed by contested case procedures comport with procedures traditionally used to respond to threats to public health, like Big Board posed.  *See, e.g.*, 5 U.S.C. § 558(c) (federal APA excusing notice and hearing requirements before "revocation . . . of a license" "in cases of willfulness or those in which public health, interest, or safety requires otherwise").

### C.     The DCAPA Claim Fails.

Big Board's claim that DC Health's regulations did not authorize suspensions for violations of COVID-19-related orders fails because Big Board overlooks several other sources of law that authorized the suspension and, in any event, Big Board misreads DC Health's statutes and regulations.  *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 723 (D.C. Cir. 2022) (rejecting claim that agency exceeded its authority under one statutory provision when another provision authorized the agency's action); *Davidson v. D.C. Bd. of Med.*, 562 A.2d 109, 112–13 (D.C. 1989) (similar).

Setting the regulations aside for a moment, the Mayor's orders provided that DC Health may "take enforcement action directly under this Order . . . to provide for the revocation,

suspension, or limitation of a license . . . of a person or entity that violates this Order." Mayor's

Order 2021-148 § III(5), 68 D.C. Reg. at 14,226; *see also* Mayor's Order 2021-147 § VIII(2), 68

D.C. Reg. at 13,958. The Mayor had authority to establish those requirements and provide for

their enforcement as "measures designed to protect persons . . . in the District" in response to a

declared emergency. D.C. Code § 7-2304(b)(3). What is more, when DC Health suspended Big

Board, the Public Emergency Act explicitly authorized the Mayor to "revoke, suspend, or limit

the license . . . of a person or entity that violates an emergency executive order." June 24, 2021

Temporary Act, 68 D.C. Reg. at 4,876. Still further, the orders also represented an exercise of

the Mayor's power to "issue rules to prevent and control the spread of communicable diseases."

D.C. Code § 7-131(a). Indeed, Big Board's notices of infraction cited the Mayor's orders and

Public Emergency Act as the bases for the violation. 1st Not. 1; 2d Not. 2. Big Board's claim

thus misses the mark because DC Health's authority to suspend Big Board for violations of the

Mayor's COVID-19 orders derived from the orders themselves and their underlying statutory

authority.

Regardless, DC Health had the statutory and regulatory authority to suspend Big Board's

license. DC Health's enabling statute states that it "may summarily suspend a license to operate

a food establishment if it determines through an inspection, or examination of employees, food,

food source, records, or other means as specified in this Code, that an imminent health hazard

exists." D.C. Code § 48-108.01(c). Regulations provide an illustrative but non-exhaustive list of

possible "imminent health hazards." 25-A DCMR § 4408.1(a)–(j). The regulations also instruct

that an imminent health hazard may exist whenever DC Health "determines through an

inspection, or examination of records or other means . . . the existence of any other condition

which endangers the public health, safety, or welfare." *Id.* § 4408.1(k). DC Health could

reasonably conclude that a deadly infectious disease, which spreads rapidly indoors among the unvaccinated and unmasked, qualifies as "an imminent health hazard."  By the same token, COVID-19 and restaurants' indifference to it "endanger[ ] the public health, safety, and welfare." *Id.*  The plain text of the regulations authorized the suspension, but even if it were a closer call, DC Health's interpretation and implementation of its regulations would receive "substantial deference."  *Mallof v. D.C. Bd. of Elections & Ethics*, 1 A.3d 383, 392 (D.C. 2010) (internal quotation marks and citation omitted).

To claim otherwise, Big Board invokes two federal cases involving challenges to federal agencies' workplace vaccination-or-testing requirement and eviction moratorium.  Compl. ¶ 58 (citing *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor* (*NFIB*), 142 S. Ct. 661 (2022) (per curiam), and *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 539 F. Supp. 3d 29 (D.D.C. 2021)). Compared to those cases, the statutory and regulatory authority here is far clearer and more on-point.  In the workplace vaccination-or-testing requirement case, the Supreme Court reasoned that the statute textually limited the agency's authority to addressing hazards specific to the workplace, which COVID-19 was not.  *NFIB*, 142 S. Ct. at 665.  No statutory authority, the Court explained, "addresses public health more generally."  *Id.*  Contrast that with the broad language here, "imminent health hazard" and "any other condition which endangers the public health, safety, or welfare," which lacks any textual limitation (like "occupational" in *NFIB*). D.C. Code § 48-108.01(c); 25-A DCMR § 4408.1(k).  Indeed, the same Court upheld a vaccination requirement for healthcare workers when the statute authorized the agency to impose conditions it "finds necessary in the interest of the health and safety."  *Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (per curiam) (internal quotation marks omitted) (quoting 42 U.S.C. §

1395x(e)(9)).  The language here addressing health and safety is more like that in *Missouri* than that in *NFIB*.

Equally misplaced is Big Board's reliance on the federal eviction mortarium cases. There, the statute provided authority to make regulations to combat infectious diseases and then provided a list of possible measures.  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2487 (2021) (per curiam) (citing 42 U.S.C. § 264(a)).  The Court held that an eviction moratorium was too unlike the listed measures, and that list cabined the agency's authority.  *Id.* at 2488.  The statute here contains no limiting list: it allows for suspensions whenever DC Health judges there to be an "imminent health hazard."  D.C. Code § 48-108.01(c). Although DC Health has provided guidance through regulations about what might qualify, those regulations—unlike the statute before the Court—speak more clearly in indicating that the list is non-exhaustive.  That is, the regulations preserve DC Health's discretion to "determine[] . . . the existence of any other condition which endangers the public health, safety, or welfare."  25-A DCMR § 4408.1(k).

Finally, these *federal* cases are unavailing for an additional reason: it is unlikely that the D.C. Court of Appeals would follow them here.  Big Board's claim arises under District law, so the question is whether D.C. Court of Appeals' precedent clearly supports its claim.  *See Daskalea*, 227 F.3d at 447.  That court has held that, when it comes to "'core' executive functions," D.C. courts "should 'accede to a request for judicial intrusion' only if it is 'plain' that the Council intended to restrict the Mayor's authority."  *Sierra Club*, 670 A.2d at 365 (quoting *Quattlebaum v. Barry*, 671 A.2d 881, 885 (D.C. Cir. 1995)).  Responding in real time to a pandemic and suspending licenses for public-health reasons are core executive functions that the D.C. Court of Appeals does not usually "second-guess."  *Id.*  The federal cases cited by Big

Board depart from that type of review—and are controversial for that reason.  *See, e.g.*, *Ala. Ass'n of Realtors*, 141 S. Ct. at 2491–92 (Breyer, J., dissenting) (disagreeing with the majority's review of the agency's statutory authority); *NFIB*, 142 S. Ct. at 673–75 (Breyer, J., dissenting) (same).  This federal court, then, should be reluctant to reverse a District agency's action taken in the name of public health when Big Board provides no indication that the D.C. Court of Appeals would do so.

## CONCLUSION

The Court should dismiss Big Board's Complaint for lack of jurisdiction or failure to state a claim.

Date: January 13, 2023.                                  Respectfully submitted,

                                                         BRIAN L. SCHWALB
                                                         Attorney General for the District of Columbia

                                                         STEPHANIE E. LITOS
                                                         Interim Deputy Attorney General
                                                         Civil Litigation Division

                                                         */s/ Matthew R. Blecher*
                                                         MATTHEW R. BLECHER [1012957]
                                                         Chief, Civil Litigation Division, Equity Section

                                                         */s/ Adam J. Tuetken*
                                                         ADAM J. TUETKEN [242215]
                                                         MICAH BLUMING [1618961]
                                                         Assistant Attorneys General
                                                         Civil Litigation Division
                                                         400 6th Street, NW
                                                         Washington, D.C. 20001
                                                         Phone: (202) 735-7474
                                                         Email: adam.tuetken@dc.gov

                                                         *Counsel for Defendants*

**APPENDIX A**

List of COVID-19 Temporary Acts Passed by the D.C. Council Since March 2020

| Passed by Council | Congress' Review Complete | D.C. Law | Expiration | Corresponding Emergency Act | LIMS Page Link |
|---|---|---|---|---|---|
| 7/7/2020 | 10/9/2020 | 23-130 | 5/21/2021 | D.C. Act 23-328 (passed 6/8/2020) | https://bit.ly/3GEd1e9 |
| 1/25/2021 | 4/5/2021 | 23-273 | 11/16/2021 | D.C. Act 23-524 (passed 12/18/2020) | https://bit.ly/3WNi2qv |
| 5/3/2021 | 6/24/2021 | 24-9 | 2/4/2022 | D.C. Act 24-30 (passed 3/7/2021) | https://bit.ly/3WPYLEI |
| 6/17/2021 | 8/21/2021 | 24-22 | 4/3/2022 | D.C. Act 24-79 (passed 5/19/2021) | https://bit.ly/3ZgFeiD |
| 9/1/2021 | 10/27/2021 | 24-39 | 6/9/2022 | D.C. Act 24-125 (passed 7/24/2021) | https://bit.ly/3WMdpNf |
| 1/24/2022 | 3/15/2022 | 24-102 | 10/26/2022 | D.C. Act 24-276 (passed 1/6/2022) | https://bit.ly/3jR5RKE |